# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| EUN HEE KIM, | ) | |
| | ) | |
| Plaintiff, | ) | No. 16 C 9138 |
| | ) | |
| v. | ) | Judge Jorge Alonso |
| | ) | |
| MICHAEL BYUN M.D., S.C., | ) | |
| MICHAEL Y. BYUN, and GRACE | ) | |
| BYUN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Eun Hee Kim, seeks unpaid overtime wages from defendants, Michael Byun M.D., S.C., Dr. Michael Y. Byun, and Grace Byun, pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq.*, and Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*. The case is before the Court on the parties' cross-motions for partial summary judgment. For the following reasons, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

In 2012, Justin Hongsup Byun, defendant Dr. Michael Y. Byun's father, was diagnosed with Alzheimer's disease and Parkinson's disease. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 7-8, ECF No. 101.) Following his diagnosis, Mr. Byun's family hired a caregiver, Soung Gil Choi, to help Mr. Byun's wife to look after him. (*Id.* ¶ 8.) Dr. Byun referred to Mr. Choi's duties as "watching" or "babysitting" Mr. Byun. (*Id.*, Ex. C, Dr. Michael Y. Byun Dep. at 11:13-13:7.)

In 2013, Mr. Byun's condition worsened, and the family decided to hire a second caregiver to ensure that someone was monitoring him throughout the day. (*Id.* ¶¶ 9, 15.) Plaintiff Eun Hee Kim met for a job interview with several members of Mr. Byun's family, including Dr. Byun; defendant Grace, his wife; and Theresa Byun, Dr. Byun's mother and Mr. Byun's wife, at the elder Byuns' home. The Byuns offered her the job. (*Id.* ¶¶ 1, 10; Defs.' LR 56.1(b)(3)(B) Resp. ¶ 6, ECF No. 115.) The parties agreed that plaintiff was to be paid $10 per hour. (Defs.' LR 56.1(b)(3)(C) Stmt. of Add'l Facts ¶¶ 1-2, ECF No. 115 at 9; *see* Pl.'s LR 56.1(a) Resp. to Stmt. of Add'l Facts ¶¶ 1-2, ECF No. 118.)

Initially, plaintiff and Mr. Choi's duties consisted of doing little more than monitoring Mr. Byun in staggered, daily shifts of approximately eight hours. But as Mr. Byun's condition worsened, the job duties came to include such additional tasks as changing Mr. Byun's diaper several times a day, feeding him, showering him, and massaging and stretching his arms and legs. (Defs.' LR 56.1(a)(3) Stmt. ¶¶ 17-18.) Defendants claim that these tasks took less than an hour per day, but plaintiff claims they took much longer, and that plaintiff often took on additional household and caregiving duties besides. (Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 9-12; Pl.'s LR 56.1(a) Resp. ¶¶ 9-12; *see also* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 23-24; Pl's LR 56.1(b)(3)(B) Resp. ¶¶ 23-24, ECF No. 106; Defs.' LR 56.1(b)(3)(B) Resp. ¶¶ 23-24.) Plaintiff was generally paid for fifty-seven hours of work per week: seven eight-hour shifts, plus an additional hour of "sign-out time," *i.e.*, five or ten minutes each day of transition time when Mr. Choi's shift overlapped with hers. (Defs.' LR 56.1(b)(3)(B) Resp. ¶¶ 10-11.) In March 2015, plaintiff asked to work more hours, and Mr. Choi agreed to give up some of his, so plaintiff began to work sixty-seven hours per week. (*Id.* ¶¶ 11-12.) The parties dispute how plaintiff's hours may have fluctuated or increased as Mr. Byun came to require lengthier periods of monitoring and care, particularly if Mr. Choi took time

2

off and plaintiff had to cover for him (*see id.* ¶¶ 13-14), but plaintiff claims that after April 2015 she worked as much as ninety-two hours per week (Defs.' LR 56.1(a)(3) Stmt., Ex. A, Pl.'s Dep. at 89:10-13).

The parties dispute how much plaintiff was actually paid per hour. They agreed on $10 an hour at the outset, but she appears to have been paid not based on a strict hour-by-hour accounting but in the form of a regular monthly salary. (Defs.' LR 56.1(a)(3) Stmt. ¶ 27.) Plaintiff initially earned $3,000 per month in regular pay; then $3,400, after she increased her hours in March 2015; and finally $3,500 per month, beginning in June 2015. (Defs.' LR 56.1(b)(3)(C) Stmt., Ex. 1, ECF No. 115-1.) Thus, plaintiff's effective hourly rate of pay varied to the extent that the hours she worked in a given month varied: in some months, she apparently earned more than $10 per hour, but in other months, in which she worked longer hours for the same pay, she may have earned less. (*Id.* ¶ 6; *see* Pl.'s LR 56.1(a) Resp. ¶ 6.) She also apparently received some supplemental payments, such as a Christmas bonus and other extra payments of which records survive in the form of checks, but for which the reasons have been forgotten. (*See id.*)

As time went on, the relationship between plaintiff and Mr. Byun's wife began to fray, and in September 2016, Dr. Byun terminated plaintiff. (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Dr. Byun Dep. at 106:5-108:8.) Plaintiff subsequently filed this lawsuit, claiming that defendants did not pay her minimum and overtime wages due under the FLSA, IMWL and IWPCA.

## **DISCUSSION**

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not weigh conflicting evidence or make credibility determinations, but the party opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013) (court must enter summary judgment against a party who "'does not come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question'") (quoting *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994)). All facts and reasonable inferences are construed in the light most favorable to the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016).

The FLSA requires employers to pay employees a minimum wage of $7.25 an hour, and the IMWL sets a minimum wage of $8.25 an hour. 29 U.S.C. § 206(a)(1)(C), 820 ILCS 105/4a(1). Additionally, under both statutes, employees who work more than 40 hours per week are entitled to overtime compensation at the rate of one and one-half times their regular rate of pay for each overtime hour worked, *see* 29 U.S.C. § 207(a)(1); 820 ILCS §105/4a, "unless they come within one of . . . various exemptions set forth" in the FLSA. *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213). The Illinois Legislature has opted not to define the circumstances where an employee is exempt from the overtime requirements of the IMWL, instead deferring to Congress and the U.S. Department of Labor, *see Resurrection Home Health Servs. v. Shannon*, 983 N.E.2d 1079, 1086 (Ill. App. 1st Dist. 2013), so the exemption analysis is identical under both statutes.

Unlike the FLSA and IMWL, "[t]he IWPCA does not establish a substantive right to payment of any particular regular or overtime wage." *Hoffman v. Roadlink Workforce Sols., LLC*,

No. 12 C 7323, 2014 WL 3808938, at *4 (N.D. Ill. Aug. 1, 2014). Wages are defined narrowly under the IWPCA as "'compensation owed an employee by an employer pursuant to an employment contract or agreement between the [two] parties.'" *Enger v. Chi. Carriage Cab Corp.*, 812 F.3d 565, 568 (7th Cir. 2016) (quoting 820 ILCS 115/2) (noting that "the IWPCA exists to hold the employer to his promise under the employment agreement[]" not to force "the judiciary to graft new terms into an employment contract without the employer's consent"). Thus, to prevail on an IWPCA claim, an employee must prove "that wages or final compensation is due to him or her as an employee from an employer under an employment contract or agreement." *Deschepper v. Midwest Wine & Spirits, Inc.*, 84 F. Supp. 3d 767, 779 (N.D. Ill. 2015) (internal quotation and citation omitted). An agreement under the IWPCA need not be formal or in writing, but rather "requires only the manifestation of mutual assent." *Barker v. Atl. Pac. Lines*, No. 13 C 1272, 2013 WL 4401382, at *8 (N.D. Ill. Aug. 14, 2013).

## I. DEFENDANTS' MOTION

Defendants seek partial summary judgment on the following grounds: (a) there was no employment relationship between plaintiff and defendant Michael Byun M.D., S.C., (b) the IMWL is not applicable because, at the time of plaintiff's employment, it excluded domestic workers from its coverage, and (c) plaintiff's IWPCA claim fails because there was no employment contract or agreement that required payment of premium wages for overtime.

### A. Employment Relationship With Michael Byun M.D., S.C.

Defendants argue that Michael Byun M.D., S.C., is entitled to summary judgment because the business entity never employed plaintiff. According to defendants, plaintiff never performed any duties related to Dr. Byun's medical practice and she was never anything other than a domestic employee of the Byun family. Defendants admit that Dr. Byun occasionally paid plaintiff with

5

corporate checks, but he claims that he only did so in emergencies when plaintiff's pay was due but he had no personal checks at hand, and he always reimbursed the corporation for those amounts. *See Berger v. NCAA*, 843 F.3d 285, 290-91 (7th Cir. 2016) (under the FLSA, status as an employee depends on the "totality of the circumstances" and courts must examine the "economic reality of the working relationship").

Plaintiff's response brief does not address this issue, so the Court deems her to have waived any claim against Michael Byun M.D., S.C. *See Merry Gentleman, LLC v. George & Leona Prods., Inc.*, 76 F. Supp. 3d 756, 761 (N.D. Ill. 2014) (failure to make an argument in response to a motion for summary judgment forfeits the argument). Even if it were not waived, the Court agrees with defendants that the evidence plainly shows that plaintiff was an employee of Dr. Byun personally, not his business entity. Defendants' motion for summary judgment is granted as to Michael Byun M.D., S.C.

### B. IMWL And Domestic Workers

Defendants argue that they are entitled to summary judgment on plaintiff's IMWL claim because the statute does not apply to domestic workers. During the time of plaintiff's employment in Mr. Byun's home, the IMWL's definition of "employee" excluded anyone who worked "[i]n domestic service in or about a private home." 820 ILCS 105/3(d)(3) (2016). In the Domestic Workers' Bill of Rights Act, 2016 Ill. Legis. Serv. P.A. 99-758 (H.B. 1288), the Illinois General Assembly amended the statute to include domestic workers, but by its terms the Domestic Workers' Bill of Rights Act became effective on January 1, 2017, several months after Dr. Byun terminated plaintiff's employment. *Id.* § 99.

Plaintiff argues that the Domestic Workers' Bill of Rights Act should apply retroactively. As plaintiff herself recognizes, however, the first step in determining whether a statute applies

6

retroactively is to determine whether the General Assembly "expressly prescribed" its "temporal reach." *Commonwealth Edison Co. v. Will Cty. Collector*, 749 N.E.2d 964, 972 (Ill. 2001) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). If the legislature has not expressly indicated the temporal reach of the statute, then, under section 4 of the Illinois Statute on Statutes, 5 ILCS 70/4, it is presumed to apply only prospectively, unless it is merely procedural in nature. *People ex rel. Madigan v. J.T. Einoder, Inc.*, 28 N.E.3d 758, 765 (Ill. 2015).

The Domestic Workers' Bill of Rights Act states that its effective date is January 1, 2017, and plaintiff does not point to any language in the statute suggesting that it should apply earlier than that, apart from vague statements of the importance of the policy enshrined in the statute. But if vague statements such as those were enough, then every statute would be applicable retroactively. The General Assembly could have drafted the Domestic Workers' Bill of Rights Act to become effective on the date of the governor's signature, or to apply to claims pending or arising on that date, but it did not do so. *Cf. Commonwealth Edison*, 749 N.E.2d at 973. The legislature simply stated that "[t]his Act takes effect January 1, 2017." 2016 Ill. Legis. Serv. P.A. 99-758 (H.B. 1288), § 99. The General Assembly has expressly prescribed the temporal reach of the statute: the statute states that it takes effect January 1, 2017, and there is nothing elsewhere in the language of the statute to suggest that the legislature intended anything else.

Even if this Court were to agree with plaintiff that the statute's terms are not sufficiently definite to expressly prescribe its temporal reach, plaintiff would still lose because, under those circumstances, the Court must presume that the statute applies only prospectively. Indeed, this presumption is all but an ironclad rule; with respect to whether a statutory amendment applies retroactively, "it is virtually inconceivable that an Illinois court will ever [have to] go beyond . . . ascertain[ing] whether the legislature has clearly indicated the temporal reach of the amended

7

statute." *Caveney v. Bower*, 797 N.E.2d 596, 603 (Ill. 2003). "If the amendatory act does *not* contain a clear indication of legislative intent, then '[i]t is to be assumed the amendatory act was framed in view of the provisions'" of section 4 of the Statute on Statutes, which "represents a clear legislative indication that the retroactive application of substantive statutory changes is forbidden," barring a clear statement in the amendatory act to the contrary. *Caveney*, 797 N.E.2d at 603 (quoting *Connell v. Crosby*, 71 N.E. 350, 352 (Ill. 1904)). Further, the Domestic Workers' Bill of Rights Act is not merely procedural because if applied to defendants, it would make them liable for conduct that they would not be liable for under the old version of 820 ILCS 105/3(d)(3); *i.e.*, it would "increase a party's liability for past conduct." *See J.T. Einoder, Inc.*, 28 N.E.2d at 765, 767. For all these reasons, the statute does not apply retroactively.

The Domestic Workers' Bill of Rights Act became effective January 1, 2017. Plaintiff filed this suit on September 22, 2016. Because domestic workers such as plaintiff were excluded from the IMWL's definition of "employee" prior to the effective date of the Domestic Workers' Bill of Rights Act, which does not apply retroactively, plaintiff cannot prevail on her IMWL claim.[1] The Court grants defendants' motion for summary judgment on that claim.

### C. IWCPA Claim And Agreement To Pay Overtime Wages

Defendants argue that they are entitled to summary judgment on plaintiff's IWCPA claim because the parties did not make overtime pay a part of their agreement, nor does the fact that the law may have required overtime pay under the circumstances make it part of the parties' agreement. *See Brand v. Comcast Corp.*, No. 12 CV 1122, 2013 WL 1499008, at *6 (N.D. Ill.

---

[1] The parties also argue over whether defendants employed at least four people, as they must for plaintiff to fall within the IMWL's definition of "employee," 820 ILCS 105/3(d)(1), but the Court need not reach this issue because it concludes that plaintiff was excluded from the IMWL's definition of "employee" for a different reason, namely, that she was employed as a domestic worker prior to January 1, 2017.

Apr. 11, 2013) (plaintiff must "point to an agreement supporting the IWPCA claim that is more than an allegation that the employer is bound by existing overtime laws").

Plaintiff responds that "[u]nder Illinois law, an employment agreement requires only mutual assent to the terms, rather than the formalities that often accompany a contract," and furthermore, "employees and employers can establish the 'material terms' of an agreement, including compensation, 'by acting in a manner consistent with an employment agreement.'" *Magpayo v. Advocate Health & Hosps. Corp.*, No. 16-CV-01176, 2018 WL 950093, at *8 (N.D. Ill. Feb. 20, 2018) (quoting *Landers-Scelfo v. Corp. Office Sys., Inc.*, 827 N.E.2d 1051, 1059 (Ill. App. Ct. 2005)). According to plaintiff, defendants paid her overtime for approximately the first two years of her employment, but in April 2015, they increased her hours without proportionally increasing her pay, and therefore effectively ceased paying overtime wages.

The Court agrees with plaintiff that, viewing the facts in the light most favorable to plaintiff and assuming the truth of her testimony, a reasonable factfinder could conclude that defendants breached an agreement to pay her overtime wages. All parties admit that their initial agreement was that plaintiff would make $10 an hour, although it appears that, in the beginning, plaintiff may have made slightly more in some months. If she started off working an eight-hour shift every day at $10 per hour (and there appears to be no dispute that she did (*see generally* Defs.' LR 56.1(a)(3) Stmt., Ex. C, Dr. Byun Dep. at 39:3-14)), with time-and-a-half pay for all hours over forty in a given week, she would have made $2,920 in a thirty-one day month ((40 hours x $10 per hour x 4 weeks = $1600 in regular pay) + (11 remaining working days per month x ($10 x 1.5) x 8 hours per day = $1320 in overtime pay) = $2,920), slightly less than the $3,000 per month that plaintiff admits she was paid. Plaintiff received even more than the time-and-a-half overtime premium required by law. But in the spring of 2015, according to plaintiff, plaintiff's hours increased

9

without a proportional increase in her pay. She claims she began to work ninety-two hours per week at $10 per hour, and she received $3,500 per month starting in June 2015. If the court assumes that ninety-two hours per week means 368 hours per month,[2] with time-and-a-half pay for all hours over forty in a given week, then plaintiff should have been paid $4,720 per month. But plaintiff was making only $3,500 per month. A jury could find that, based on defendants' actions prior to the spring of 2015, defendants had agreed to pay plaintiff at least $10 per hour plus time-and-a-half wages for overtime, but did not hold up their end of the bargain when plaintiff began to work more overtime than they had initially anticipated. *See Landers-Scelfo*, 827 N.E.2d at 1059 ("Synergy could have manifested its assent to plaintiff's commission arrangement simply by paying her according to it, and plaintiff could have manifested her assent . . . by continuing to work after it began paying her."). Defendants' motion for summary judgment is denied as to the IWPCA claim.

## II. PLAINTIFF'S MOTION

Plaintiff seeks summary judgment on the issue of liability on her FLSA claim, arguing that defendants did not pay her the overtime wages she was due and no reasonable jury could conclude otherwise based on the undisputed facts. According to plaintiff, the only issue remaining for trial is the amount of damages.

Defendants argue there is a genuine factual dispute on the issue of whether plaintiff is exempt from the protections of the FLSA because she provided only "companionship services." The FLSA does not apply to "any employee employed in domestic service employment . . . to provide companionship services for individuals who (because of age or infirmity) are unable to

---

[2] Plaintiff's expert reached a different number of total monthly hours, multiplying ninety-two hours by 4.3 weeks, rather than 4, to calculate that plaintiff worked 398.67 hours per month. (Defs.' LR 56.1(a)(3) Resp., Ex. 4, Smith Dep. at 28:16-23.) The Court need not determine at this stage whether this methodology is proper and finds support in the record because, even using the lower multiplier, a reasonable jury could conclude that plaintiff was underpaid.

10

care for themselves." 29 U.S.C. § 213(a)(15). Department of Labor regulations define "companionship services," in pertinent part, as follows:

> (a) As used in section 13(a)(15) of the Act, the term companionship services means the provision of fellowship and protection for an elderly person or person with an illness, injury, or disability who requires assistance in caring for himself or herself. The provision of fellowship means to engage the person in social, physical, and mental activities, such as conversation, reading, games, crafts, or accompanying the person on walks, on errands, to appointments, or to social events. The provision of protection means to be present with the person in his or her home or to accompany the person when outside of the home to monitor the person's safety and well-being.
>
> (b) The term companionship services also includes the provision of care if the care is provided attendant to and in conjunction with the provision of fellowship and protection and if it does not exceed 20 percent of the total hours worked per person and per workweek. The provision of care means to assist the person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring) . . . .

29 C.F.R. § 552.6. Thus, an employee who provides "companionship services" in the form of "protection" by "monitor[ing an elderly] person's safety and well-being," and who also provides "care" by "assist[ing the elderly] person with activities of daily living (such as dressing, grooming, feeding, bathing, toileting, and transferring)," is exempt from the protections of the FLSA if she is engaged in "the provision of care" for less than twenty percent of her total working hours per workweek.

The parties' Local Rule 56.1 statements and responses show that there is a genuine, material factual dispute on the issue of how much of her day plaintiff spent providing "care," as opposed to "protection." The parties agree that plaintiff spent some amount of time each day changing Mr. Byun's diaper and helping him dress, bathe, and eat. According to defendants, these tasks took, at most, fifty minutes per shift, barely more than ten percent of an eight-hour shift. According to plaintiff, they took as much as three and a half hours. (*Compare* Defs.' LR 56.1(b)(3)(C) Stmt. ¶¶ 9-12 *with* Pl.'s LR 56.1(a) Resp. ¶¶ 9-12.) Even assuming the truth of

plaintiff's testimony that she worked ninety-two hour weeks, *i.e.*, approximately thirteen-hour days, three and a half hours amounts to more than twenty percent of plaintiff's workday. A trial is the only proper way to resolve this factual disparity. Plaintiff's motion for summary judgment on the issue of liability is denied.[3]

One other matter deserves comment. In this Opinion, the Court has not relied on the opinion or testimony of plaintiff's proposed expert, Dr. Stan Smith. Defendants argue that Dr. Smith's proposed testimony is inadmissible under Federal Rule of Evidence 702 because it is based not on scientific, technical, or professional expertise but on simple arithmetic. According to defendants, because it is not based on expertise, Dr. Smith's opinion would be unhelpful to the trier of fact, and additionally, it might prejudice defendants by giving simple arithmetic a "gloss of expertise." *See Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *2 (N.D. Ill. Feb. 3, 2011).

Plaintiff replies that even when an expert's testimony reduces to simple arithmetic, it may still be of assistance to a jury and therefore admissible, as one court in this district explained as follows:

> [The expert's] opinions rely on basic mathematical computations that are relatively simple to understand. The simplicity underlying his methodology does not, however, render his opinion unhelpful to the trier of fact. As the Seventh Circuit has stated, "[a] jury cannot keep in mind all of the figures that might enter into a determination as to whether overtime payments were due. Computations and summaries based upon evidence before the Court, in many instances, would be very helpful to a jury." *Wirtz v. Turner,* 330 F.2d 11, 14 (7th Cir. 1964) (holding that expert testimony of an accountant on the issue of damages calculations under the FLSA would assist the trier of fact and was ultimately admissible). Accordingly,

---

[3] The parties also briefly argue over whether plaintiff falls within an exception to the companionship services exemption for third-party employees, *i.e.*, caregivers who are not employed by the person for whom they care. It is clear from the plain language of the relevant Department of Labor regulation that this exception applies only to a third-party employer who is not a "member of the family or household" of the individual who receives the employee's companionship services. 29 C.F.R. § 552.109(a). Defendants are members of Mr. Byun's family, so they are not third-party employers within the meaning of this regulation, and this regulation does not apply as a matter of law.

given the various categories of compensatory damages Plaintiffs seek in this
collective action, as well as the multi-stepped processes needed to calculate those
damages, the Court finds that [the expert's] opinion will assist the trier of fact.

*Smith v. Family Video Movie Club, Inc.*, No. 11 C 1773, 2015 WL 1542663, at *5 (N.D. Ill. Mar. 31, 2015). The Court fully agrees with this reasoning, as far as it goes, *see Elorac, Inc. v. Sanofi-Aventis Canada, Inc.*, No. 14 C 1859, 2017 WL 3592775, at *12 (N.D. Ill. Aug. 21, 2017) (quoting same language of *Smith*), but the reasoning of *Smith*, a collective action with multiple plaintiffs, applies with less force here, a case involving overtime wages claimed by a single plaintiff. In this relatively simple case, the Court fails to see why the jury will have any trouble "keep[ing] in mind all the figures that might enter into a determination as to whether overtime payments were due," especially considering the danger that Dr. Smith's testimony may prejudice the jury by putting a "gloss of expertise" not only on the calculation of damages but on plaintiff's claim more generally.

The Court need not rule on the admissibility of Dr. Smith's testimony now. Defendants have not moved to exclude it; they have merely stated their position that it is inadmissible in response to plaintiff's motion for summary judgment. Dr. Smith's proposed testimony is not material to whether there is a genuine factual dispute on any issue the parties have raised in their motions for summary judgment. The Court will revisit the issue if defendants raise it in a motion *in limine* or other appropriate motion prior to trial.

### **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment [102] is granted in part and denied in part. The motion is granted as to defendant Michael Byun M.D., S.C., and as to the Illinois Minimum Wage Law claim; it is otherwise denied. Plaintiff's motion for summary judgment [107] is denied. Status hearing previously set for 4/9/19 is stricken and reset to 3/21/19

13

at 9:30 a.m. Parties are directed to meet and confer to discuss settlement. Parties shall file a joint status report by 3/18/19.

SO ORDERED.                                              ENTERED:  March 6, 2019

                                                                                    _____
                                                                                    **HON. JORGE ALONSO**
                                                                                    **United States District Judge**